Oscar GRUSS, Plaintiff-Appellee,

and

Oscar Gruss & Son, Plaintiff,

v.

The CURTIS PUBLISHING COMPANY,
Defendant-Appellant.

No. 594, Docket 75–7546.

United States Court of Appeals,
Second Circuit.

Argued March 11, 1976.

Decided April 21, 1976.

---

Theodore L. Marks, New York City (Lee, Cash & Marks, New York City, of counsel), for defendant-appellant.

Michael P. Fuchs, New York City (Kass, Goodkind, Wechsler & Gerstein, New York City, of counsel), for plaintiff-appellee.

Before FRIENDLY, MULLIGAN and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

This action, in the District Court for the Southern District of New York, arises from a plan of recapitalization adopted by defendant The Curtis Publishing Company (Curtis), a Pennsylvania corporation, at an annual meeting of shareholders on September 14, 1972. Curtis' capitalization had consisted of $7,485,000 of Subordinated 6% Income Debentures due October 1, 1986, bearing $2,470,000 of accrued interest; 334,470 shares of $4 Prior Preferred Stock on which $10,034,100 of cumulative dividends were unpaid as of May 1, 1972; 239,418 shares of $1.60 Prior Preferred Stock on which $1,436,508 of cumulative dividends were also unpaid; and 3,555,568 of Common Stock. The objective of the plan was to exchange a new Common Stock for the two series of Prior Preferred Stock and so many of the Income Debentures as consented, thereby eliminating the preferred stocks with the large arrearages of dividends and part of the Debentures and leaving Curtis with a simple capital structure of the unexchanged Debentures and Common Stock. The exchange ratios were 9.84 shares of new Common Stock for each $100 of Debentures, 1.54 shares for each share of $4 Dividend Prior Preferred Stock, 0.93 shares for each share of $1.60 Dividend Prior Preferred Stock, and 0.10 shares for each share of existing common stock. These ratios were determined by giving the Debentures and the two issues of Prior Preferred Stock five times their average market value in terms of the average market value of the old common stock, giving the old common stock its average market value, and then dividing all the ratios by 10 to avoid issuance of an undue number of shares of new common stock.

The Proxy Statement for the annual meeting contained the following:

## APPRAISAL RIGHTS

The Business Corporation Law of Pennsylvania sets forth certain rights and remedies applicable to holders of shares of Prior Preferred Stock of Curtis who may object to and desire to dissent from the cancellation of their right to receive dividends which have accrued but have not been declared. The following brief summary of such rights and remedies does not purport to be complete and is qualified in its entirety by reference to Sections 810 and 515 of such law, a copy of which appears in Exhibit C hereto. Under such provisions, a holder of Prior Preferred Stock of Curtis who wishes to demand payment of the fair value of his shares must file with Curtis, prior to the

commencement of voting by shareholders upon the Amended and Restated Articles of Incorporation, a written objection thereto and must not vote in favor of this proposal. Voting against the proposal or giving a proxy to vote against it will not constitute such a written objection. In addition, such shareholder must, within 20 days after the date on which the vote on this proposal was taken, make written demand on Curtis for payment of the fair value of his shares, stating the number and class and series, if any, of the shares owned by him with respect to which he dissents. Within 20 days after such demand, such shareholder must submit his certificate or certificates to Curtis for notation that such demand has been made. Within 30 days after the Amended and Restated Articles of Incorporation become effective, Curtis will give written notice thereof to dissenting shareholders who have complied with the foregoing requirements and will make a written offer to each such shareholder to pay a specified price as the fair value of his shares. If, at any time after 60 days and within 90 days after the Amended and Restated Articles of Incorporation become effective, the fair value is not agreed upon between Curtis and a dissenting shareholder, the shareholder may demand court proceedings to value his shares. The costs and expenses of any such proceedings will be assessed against Curtis but may be fully or partly apportioned and assessed against any or all of the dissenting shareholders who are parties to the proceedings if the court shall find that the action of such shareholders in failing to accept Curtis' offer to pay for the shares was arbitrary, vexatious or not in good faith.

The statute provides that unless a shareholder of Curtis files a written objection and makes the necessary demand within the 20-day period described above, he shall be conclusively presumed to have consented to the Amended and Restated Articles of Incorporation and shall be bound by the terms thereof.

The foregoing relates only to holders of Prior Preferred Stock of Curtis. The holders of Common Stock of Curtis will have no appraisal rights.

Copies of §§ 810 and 515 of the Pennsylvania Business Corporation Law were attached as Exhibit C; we quote in the margin § 515B, D, E, F and H.[1] Exhibit C did

---

1. B. If any shareholder of a business corporation shall file with such corporation, prior to the commencement of the voting by shareholders upon the plan at the meeting of shareholders at which a plan is submitted to a vote, a written objection to such plan, and shall not vote in favor thereof, and such shareholder, within twenty days after the date on which the vote approving the plan was taken, shall also make written demand on the corporation, or the surviving or new corporation resulting from the plan, for the payment of the fair value of his shares, such corporation shall pay to such shareholder the fair value of his shares as of the day prior to the date on which the vote was taken without regard to any depreciation or appreciation thereof in consequence of the plan upon surrender of the share certificate or certificates representing his shares. Neither a proxy nor a vote against the plan shall constitute such a written objection. The demand of the shareholders shall state the number and class and series, if any, of the shares owned by him with respect to which he dissents. A dissenting shareholder may dissent as to all or less than all of those shares registered in his name of which he is not the beneficial owner, but there may not be dissent with respect to some but less than all shares of the same class or series owned by any given beneficial owner of shares whether or not the shares so owned by him are registered in his name. Unless a shareholder files such written objection and also makes such demand within the twenty-day period, he shall be conclusively presumed to have consented to the plan, and shall be bound by the terms thereof. Any shareholder making such demand shall thereafter be entitled only to payment as in this section provided and shall not be entitled to vote or to exercise any other rights of a shareholder as to the shares with respect to which he dissents.

not include a subsection, § 2(18), of the general definitions section in the Pennsylvania Business Corporation Law which states:

"Shareholder" means a registered owner of shares in a business corporation.

Plaintiff Oscar Gruss, an experienced stock-broker, is a general partner of Oscar Gruss & Son, which is a member of the New York and American Stock Exchanges and the National Association of Securities Dealers. At the time of Curtis' 1972 meeting he was the beneficial owner of 12,560 shares of

D. Within thirty days after such plan became effective, the corporation or in the case of a merger or consolidation, the surviving or new corporation, domestic or foreign, shall give written notice thereof to each dissenting shareholder who has made demand as herein provided, and shall make a written offer to each such shareholder to pay for such shares at a specified price deemed by such corporation to be the fair value thereof. Such notice and offer shall be accompanied by a balance sheet of the corporation as of the latest available date and not more than twelve months prior to the making of such offer and a profit and loss statement of such corporation for the twelve months' period ended on the date of such balance sheet.

E. If within sixty days after the date on which such plan became effective, the fair value of such shares is agreed upon between any such dissenting shareholder and the corporation, payment therefor shall be made within ninety days after the date on which such plan became effective, upon surrender of the certificate or certificates representing such shares. Upon payment of the agreed value, the dissenting shareholder shall cease to have any interest in such shares.

F. A dissenting shareholder who is unable to agree with the corporation on the fair value of his shares may demand proceedings to value his shares at any time after sixty days and within ninety days after the date on which the plan became effective. Within thirty days after receipt of any such written demand, the corporation shall, or at its election at any time after sixty days and within ninety days after the effective date the corporation may, file a petition in the court of common pleas in the county in this State where the registered office of the corporation is located, praying that the fair value of such shares be found and determined. If in the case of a merger or consolidation, the surviving or new corporation is a foreign corporation without a registered office in this State, such petition shall be filed in the county where the registered office of the domestic corporation was last located, which county shall be deemed to be the county where the cause of action arose and all process shall be served upon such foreign corporation as provided in section 1011 of this act. If the

corporation has not instituted the proceeding as herein provided, any dissenting shareholder may do so in the name of the corporation at any time within thirty days after the expiration of such ninety day period. All dissenting shareholders wherever residing shall be made by the corporation parties to the proceeding as an action against their shares quasi in rem. A copy of the petition shall be served on each dissenting shareholder who is a resident of this State and shall be served personally or by registered or certified mail on each dissenting shareholder who is a nonresident. The jurisdiction of the court shall be plenary and exclusive. All shareholders who are parties to the proceeding shall be entitled to judgment against the corporation for the amount of the fair value of their shares as of the day prior to the date on which the vote was taken without regard to any depreciation or appreciation thereof in consequence of the plan. The court may, if it so elects, appoint one or more persons as appraisers to receive evidence and recommend a decision on the question of fair value. The appraisers shall have such power and authority as shall be specified in the order of their appointment or an amendment thereof. The judgment shall be payable only upon and concurrently with the surrender to the corporation of the certificate or certificates representing such shares. Upon payment of the judgment, the dissenting shareholder shall cease to have any interest in such shares.

H. The costs and expenses of any such proceeding shall be determined by the court and shall be assessed against the corporation, but all or any part of such costs and expenses may be apportioned and assessed as the court may deem equitable against any or all of the dissenting shareholders who are parties to the proceeding to whom the corporation shall have made an offer to pay for the shares if the court shall find that the action of such shareholders in failing to accept such offer was arbitrary or vexatious or not in good faith. Such expenses shall include reasonable compensation for and reasonable expenses of the appraisers but shall exclude the fees and expenses of counsel for and experts employed by any party, but if the fair value of the shares as determined materially exceeds the amount which the corporation of-

the $4 Prior Preferred Stock, which were registered in the name of Oscar Gruss & Son. On receipt of the proxy material Oscar Gruss & Son initially returned an affirmative proxy for these shares.[2] However, Mr. Gruss directed Julius Anreder, a securities analyst employed by the firm, to study the plan. Anreder concluded it would be advisable for Mr. Gruss to exercise dissenters' rights. He prepared a letter, dated September 12, 1972, to Mr. SerVaas, the chief officer of Curtis. The letter on the letterhead of Oscar Gruss & Son but signed by Mr. Gruss,[3] is set forth in the margin.[4] Enclosed with it was a negative proxy which, of course, revoked its predecessor. Apparently the proxy found its way into the hands of Curtis' general counsel, the respected Philadelphia firm of Morgan, Lewis & Bockius, but was not voted. The failure to vote this and the use of the prior affirmative proxy, which is unexplained, had no effect on the approval of the plan by the holders of more than the required two-thirds of the two classes of preferred stock, nor of course, on the required affirmative majority of common stock holders.

On September 21, 1972, Mr. Gruss wrote Mr. SerVaas, again on the letterhead of Oscar Gruss & Son, making a demand for payment of the fair value of his $4 Prior Preferred shares. At the same time Oscar Gruss & Son sent a letter enclosing the certificates for Mr. Gruss' shares for notation of the demand thereon. On the advice of counsel Curtis rejected Mr. Gruss' demand because the exercise of dissenters' rights had been incorrectly initiated by the objection of Gruss as the beneficial owner rather than by the partnership, Gruss and Son, as record owner. Mr. Gruss did not pursue the matter further in Pennsylvania; instead, on January 17, 1973, he filed the complaint in this action in the District Court for the Southern District of New York.

The first count of the complaint alleged that the proxy materials were false and misleading in violation of § 14(a) of the

---

fered to pay therefor, or if no offer was made, the court in its discretion may award to any shareholder who is a party to the proceeding such sum as the court may determine to be reasonable compensation to any expert or experts employed by the shareholder in the proceeding.

2. Actually this proxy did not affirmatively designate a vote one way or the other; the proxy instructions provided, however, that if no explicit choice were indicated on the returned proxies, they would be voted in favor of the plan for recapitalization.

3. Inspection of another signature, virtually identical to the one on the September 12 letter, but occurring on a September 21 letter over the typed name "Oscar Gruss & Son," suggests that a typist's error and not a mis-signing may be responsible for the entire contretemps. Neither signature is so clear, however, that we can say which—"Oscar Gruss" or "Oscar Gruss & Son"—is the proper reading.

4.        OSCAR GRUSS & SON
MEMBERS NEW YORK STOCK EXCHANGE
80 PINE STREET, NEW YORK, N. Y. 10005
September 12, 1972
Mr. Beurt R. SerVaas, Chair of the Board
The Curtis Publishing Company
1701 The Fidelity Building
Philadelphia, Pennsylvania 19109

Dear Mr. SerVaas:
Enclosed please find my proxy for 12,560 shares of Curtis Publishing $4.00 Dividend Series Prior Preferred Stock series registered in the name of Oscar Gruss & Son, of which I am beneficial owner.
As you will note I am voting against proposal No. 3 (three) proposing the adoption of the plan of reorganization outlined in the proxy material dated July 27, 1972 which was sent to me.
In addition, pursuant to Sections 810 and 515, of the Business Corporation Law of Pennsylvania, I hereby object to this proposal since it makes inadequate provision for the rights and preferences of my preferred stock.
It is my intention to demand payment of the fair value of my shares within 20 days after the meeting date if it is approved by the shareholders.
      Very truly yours,
      /s/ OSCAR GRUSS
      OSCAR GRUSS
OG:pm
Enc.

Securities Exchange Act and Item 2 of Schedule 14A,[5] in that they failed to define the words "holders of shares" and to state that the term "shareholder" was defined by § 2(18) of the Business Corporation Law of Pennsylvania to mean a "registered owner of shares" rather than an actual or beneficial owner.[6] The second count set forth a pendent claim that plaintiff was in fact entitled to an appraisal under Pennsylvania law. Plaintiff's interest lay in the first count.

The district court held that the Proxy Statement was false and misleading since the failure to define the term holder "created a typical 'trap for the unwary.'" Plaintiff was thus entitled to receive the equivalent of the appraisal rights which the court thought he had lost by failing to see to it that all communications were in the name of Oscar Gruss & Son, rather than Oscar Gruss. The court found the value of the $4 Prior Preferred Stock to be $15 per share[7] and accordingly awarded judgment for $188,400 plus a $1,500 appraisal fee and pre-judgment interest. Without discussion the judge found Curtis was entitled to judgment on the pendent claim—doubtless a correct conclusion since Mr. Gruss' right to an appraisal apparently had become time-barred. Defendant has appealed from the judgment against it. We reverse and direct dismissal of the complaint.

Our first ground for reversal is that plaintiff failed to show that he was in fact deprived of the appraisal rights accorded by the Pennsylvania Business Corporation Law. The hypertechnical stand taken by Curtis in rejecting plaintiff's demand did not end the matter. Plaintiff's situation was not at all like a case where all communications had come from a name not appearing on the stock records and nothing had occurred that would apprise the company that objection was being voiced by the registered owner. Here the letter of objection itself, on the firm's letterhead, disclosed that the 12,560 shares were registered in the name of Oscar Gruss & Son, and the signature could well be construed as including action by Mr. Gruss as a member of the partnership that bore his name. This sufficed to meet the statutory objective of advising Curtis that if it proceeded with the recapitalization plan it should reckon with the probability of an appraisal demand for these shares. Similarly, both September 21 letters were on the Oscar Gruss & Son letterhead, each referred to the other, and Oscar Gruss' letter making demand promised delivery of shares by the record holder. The receipt of those shares

---

**5.** This requires that, in a case like the present, a proxy statement shall "Outline briefly the rights of appraisal or similar rights of dissenters with respect to any matter to be acted upon and indicate any statutory procedure required to be followed by dissenting security holders in order to perfect such rights."

**6.** We omit allegations in the first count, which were also the basis for a third count subsequently dismissed, that the proxy materials were false and misleading because they referred to sections of the Business Corporation Law by the numbers contained in the statute as enacted by the Pennsylvania legislature rather than with a preceding 1 (e. g., § 1515 rather than § 515) as they appear in Purdon's Pennsylvania Statutes Annotated. This is like saying that it would be a violation of the Securities Exchange Act to refer to "§ 14" of that Act rather than to "15 U.S.C. § 78n."

**7.** This compared with a June, 1972 market high of $4\frac{3}{4}$ before the plan had been announced; in August, after the proxy material had been circulated, the stock fell to $2\frac{1}{8}$. In 1971 the high was 9, in the first quarter; the low for that quarter was 5. The judge's calculation was based on there being a 25% chance that, without the recapitalization plan, Curtis could survive until 1986 and then be able to pay off the Debentures with $8,981,000 accrued interest, at which time it would also pay the accumulated dividends on the Prior Preferred stock. Apart from other difficulties such as the derivation of the 25% probability, we do not understand on what basis Mr. SerVaas, whose services were considered to be an important plus for Curtis and whose interests lay primarily in the common stock, could reasonably be expected to labor, Sisyphus-like for 17 years for the benefit of the holders of Debentures and Prior Preferred stock. However, in view of our conclusions on the merits we are not required to go into these matters.

surely dispelled any reasonable doubt as to the authority for objection. Although the leading Pennsylvania cases on the subject, *Era Co., Limited v. Pittsburgh Consolidation Coal Co.,* 355 Pa. 219, 49 A.2d 342 (1946); *Martin v. Pittsburgh Consolidation Coal Co.,* 355 Pa. 223, 49 A.2d 344 (1946); *In re Kreher,* 379 Pa. 313, 108 A.2d 708 (1954), firmly enforce the principle that a company is entitled to have its attention called to names identifiable on its records, none of these approaches the extent of technicality that would have been necessary to sustain the position taken by Curtis here. Indeed Mr. Gruss' case is not essentially different from that of the holders of the 900 shares in *Kreher* in whose behalf an objection was entered by an attorney, also not the holder of record, and whose appraisal rights were vindicated. Rather than deciding his case under Pennsylvania law against himself and rushing into the federal court in New York, Mr. Gruss could have invoked the aid of a Pennsylvania court;[8] our prediction is that it would have sustained his right to an appraisal—if, indeed, Curtis had persisted in its obduracy, which may be doubtful since it was confronted with admittedly valid demands by other shareholders.

■ Alternatively we hold that plaintiff failed to show that the proxy statement was false and misleading.[9] The most common rule[10] is that objections giving rise to appraisal rights must be made by stockholders of record, just as voting rights can only be exercised by such holders.[11] Determination of the persons entitled to vote is one of the functions performed by setting a record date, and the Notice of Annual Meeting stated that the board of directors had fixed July 27, 1972 "as the record date for the determination of holders of Prior Preferred Stock and Common Stock entitled to notice of and to vote at the meeting." The reference to "holders of shares" and "shareholder[s]" in the section of the proxy statement entitled "Appraisal Rights" which we have quoted must be read in this light. Mr. Gruss must have known that he was receiv-

---

8. Counsel's endeavor to explain the failure to seek relief in Pennsylvania on the basis that § 515 allows resort to the courts only when a company has made an offer which the objector has rejected is wholly unpersuasive. Counsel cites no Pennsylvania authority for so perverse a reading of the statute, and we find no basis for one in the language. The reference in § 515F to "A dissenting shareholder who is unable to agree with the corporation on the fair value of his shares" is broad enough to include a shareholder who is "unable to agree" because the corporation has offered nothing. Beyond this § 515H explicitly includes the case where "no offer is made." See note 1, *supra.*

9. In so holding we do not at all accept Curtis' argument that civil liability for a false or misleading proxy statement exists only where the defect concerns the investment decision rather than the method for exercising dissenters' rights. If, for example, a proxy statement overstated the period in which objection must be made, a plaintiff relied upon this, and state law would not hold the company to be estopped, we have little doubt that civil liability under § 14(a) would exist.

10. Many states limit the right to demand payment to stockholders of record, see e. g., *Salt Dome Oil Corp. v. Schenck,* 28 Del.Ch. 433, 41 A.2d 583 (1945); *Goodisson v. North American Securities Co.,* 40 Ohio App. 85, 178 N.E. 29 (1931); *Brown v. Hedahl's–Q.B.&R., Inc.,* (North Dakota), 185 N.W.2d 249 (1971); but this rule is by no means without exception, see *Applications of Friedman,* 184 Misc. 639, 54 N.Y.S.2d 45 (Sup.Ct.), *modified,* 269 App.Div. 834, 56 N.Y.S.2d 516 (1st Dept. 1945), and at least one jurisdiction has held both beneficial owners *and* holders of record to be entitled to exercise dissenters' rights, compare *Bache & Co. v. General Instrument Corp.,* 74 N.J.Super. 92, 180 A.2d 535 (1962), *aff'd* 42 N.J. 44, 198 A.2d 759 (1964), with *Bohrer v. U. S. Lines,* 92 N.J.Super. 592, 224 A.2d 348 (1966).

11. Because of this the rules of the New York Stock Exchange and other exchanges have long required member firms to forward proxy materials received by them as registered owners to the beneficial owners. See, e. g., Rule 451, N.Y.S.E. Constitution and Rules; Rule 576, American Stock Exchange Constitution and Rules. Banks and others acting as custodians for securities follow the same course. An SEC rule, effective December 20, 1974, requires issuers to furnish such record holders sufficient copies of proxy materials to enable them to discharge these duties, see 17 C.R.F. § 240.14a–3(12)d; in practice this had long been done by most issuers.

ing the proxy material through his firm as record holder and should have realized that communications in the other direction should emanate from the same source.

To be sure, in the blinding glare of hindsight one can see that it would have been better if the proxy materials had included the definition in § 2(18) of the Pennsylvania Business Corporation Law. But we cannot sustain the district court's conclusion that failure to do this constituted negligence by Curtis—the standard of culpability we have held applicable as a minimum in damage suits for violations of the Proxy Rules. *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1298–1301 (2 Cir. 1973).[12] The relevant portions of the Proxy Statement did not lead in the wrong direction; plaintiff's claim is that they did not lead so far in the right one as to eliminate any possibility of error.

This is too strict a standard, at least for the present case. In the first place, it is hardly clear that Curtis is solely responsible for a failure to inform the beneficial owner of all the requirements for the assertion of appraisal rights, since Curtis could reasonably assume that the holder of record, whose duty it was to pass the proxy solicitation on to the beneficial owner, would take precautions to see that any objection was properly made. Here there was every reason to rely on a high estimation of the competence and reliability of the record holder, an established and sophisticated securities firm; there was little likelihood that proper care would not be used; and since the beneficial owner was himself the head of the securities investment firm, it would appear to have been easy for "the actor himself [to have taken] precautions," see Prosser, Law of Torts, 176–77 (4th Ed.). Even if Curtis had some duty to anticipate and guard against the conduct of erring beneficial owners, this would be measured against a realistic assessment of the capabilities and probable behavior of the parties involved, see Second Restatement of Torts, §§ 290, 302 (1965). We do not have here the case of proxies having been forwarded by an inexperienced country bank to Auntie Mame; surely it is too much to expect that a company should anticipate that the head of a successful investment house would err with respect to his own securities held in the firm name—if err he did.[13]

Moreover, plaintiff offered no evidence of any practice by lawyers in general or Pennsylvania lawyers in particular to caution expressly that, in order to qualify for appraisal rights, objections must be made by the holder of record.[14] Although

---

**12.** In its recent decision imposing a standard of culpability higher than negligence for violation of § 10(b) of the Securities Exchange Act and the SEC's Rule 10b–5, the Supreme Court took note of our ruling in *Gamble-Skogmo* that negligence could create liability under § 14(a), without approving or disapproving it. *Ernst & Ernst v. Hochfelder*, —— U.S. ——, ——, 96 S.Ct. 1375, 1388, 47 L.Ed.2d 668, 685 (1976), 44 U.S.L.W. 4451, 4459, n. 28.

**13.** We see no force in the repeated references to the fact that, however experienced Mr. Gruss was in proxy matters, Mr. Anreder was not. It was scarcely foreseeable that the head of a stock exchange firm with a proxy department at his disposition would delegate the preparation of a formal notice of objection to a securities analyst. In view of our holding we are not obliged to consider Curtis' contention on the score of contributory negligence by the plaintiff.

**14.** In support of a motion for a new trial, Curtis submitted, *inter alia,* an affidavit of the partner in Morgan, Lewis & Bockius who supervised the preparation of the Curtis Proxy Statement. This stated that prior to the institution of this action he had "never seen an articulation of appraisal rights under the Business Corporation Law of Pennsylvania, either prepared by Morgan, Lewis & Bockius or by any other Pennsylvania law firms or lawyers, which expressly states that the appraisal rights had to be exercised by the record holder, as opposed to the beneficial owner." We do not fault the judge for denying the new trial motion on the ground that this evidence and material showing that all other objections had been made by record owners, including two New York Stock Exchange firms acting through their proxy departments on behalf of beneficial owners, were not newly discovered. Still it was the plaintiff's burden to show negligence not the defendant's to negate it.

absence of such a custom or practice is not conclusive in a defendant's favor, it is entitled to weight. See the discussion in *SEC v. Geon Industries, Inc.,* 531 F.2d 39, 52–53 (2 Cir. 1976). There likewise was no evidence that the Proxy Statement had proved to be a "trap for the unwary" for anyone but Mr. Gruss—if, indeed, it was as to him—or that similar proxy statements by other Pennsylvania corporations had proved to be so.

The judgment in favor of the plaintiff is reversed with instructions to dismiss the complaint. Mr. Gruss is, of course, entitled to receive the common stock issuable in respect of his $4 Prior Preferred shares under the recapitalization plan.